# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 17, 2008

Charles R. Fulbruge III
Clerk

No. 06-41680

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

DAVID LEE JACKSON,

Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Texas

Before SMITH, WIENER, and HAYNES, Circuit Judges.
JERRY E. SMITH, Circuit Judge:

David Jackson was sentenced to death for murder. He appeals, arguing that (1) the district court refused to conduct a hearing to determine whether his due process rights were violated by prosecutorial delay; (2) the Federal Death Penalty Act ("FDPA") is unconstitutional; (3) the district court improperly dismissed two jurors during voir dire; (4) the court allowed improper testimony; (5) the court incorrectly excluded certain pieces of evidence; (6) the court unconstitutionally restricted counsel's ability to object; (7) the court erred by not al-

lowing Jackson to impeach a government witness with evidence of a prior conviction for sexual assault; (8) the court incorrectly allowed the government to impeach one of Jackson's witnesses with a non-final conviction; (9) Jackson should have been allowed to allocute; (10) the jury should have been instructed at sentencing that it could consider "residual doubts" about Jackson's guilt; (11) the verdict is inconsistent; and (12) the district court incorrectly denied a motion for new trial. Finding no reversible error, we affirm.

I.

Jackson, a federal prisoner, began arguing with another inmate, Daryl Brown, while a third inmate, Arzell Gulley, watched. A fight broke out, the details of which are disputed: Jackson claims that Brown pulled out a shank,[1] but the government contends that Brown was unarmed and only attempted to begin a fistfight. In any case, the confrontation culminated with all three running from the yard where the argument started and through one of the prison units into a cell, where Jackson or Gulley allegedly held Brown as the other attacked him with a shank. After approximately thirty seconds, Jackson and Gulley left the cell walking in opposite directions. Brown, bleeding profusely, collapsed and was soon pronounced dead.

Jackson was apprehended with Brown's blood on his clothes and an injury to his palm consistent with recent use of a shank. While held by security, he tried to flush gambling paraphernalia down the toilet. When guards tried to place another inmate in the special housing unit with him, he allegedly told officials that he would kill the inmate if the inmate were not removed, saying "if you

---

[1] A shank is a homemade knife.

2

don't believe me, look at the [security] tapes, I'll kill again."

A grand jury indicted Jackson and Gulley for murder and possession of a dangerous weapon in prison. The district court granted a motion to sever their trials, and Jackson was separately reindicted, convicted on both counts, and sentenced to death.

At sentencing, the government presented evidence of Jackson's other convictions, including multiple counts of armed robbery and various firearms charges, and testimony about his poor disciplinary record in prison. An expert witness for the government who had conducted psychiatric evaluations of Jackson testified that there was a high probability that he would commit violent crimes in the future.

Jackson presented evidence of a poor home life growing up, low intelligence, post-traumatic stress disorder, and institutionalization. He also noted that the government had not sought the death penalty against Gulley, and he submitted an apology he had written for his most recent armed robbery. Jackson also apologized to Brown's family, though he blamed Brown for starting the fight. Jackson explained, "I just wanted to stab [Brown]. I didn't want to kill him."

## II.

The district court's factual findings are reviewed for clear error; its legal conclusions, de novo. United States v. Avants, 367 F.3d 433, 441 (5th Cir. 2004). We review for abuse of discretion the decision to exclude jurors, United States v. Fields, 483 F.3d 313, 357 (5th Cir. 2007), cert. denied, 128 S. Ct. 1065 (2008); evidentiary decisions, United States v. Marrero, 904 F.2d 251, 260 (5th Cir.

1990); rulings regarding trial orderliness, United States v. Redd, 355 F.3d 866, 876-77 (5th Cir. 2003); refusals to give requested jury instructions, United States v. Arnold, 416 F.3d 349, 356 (5th Cir. 2005); and denials of new trials, United States v. Rivera, 295 F.3d 461, 470 (5th Cir. 2002).

## A.

Jackson raises Fifth and Sixth Amendment challenges to the lengthy delays in his prosecution. The murder occurred in December 1999, but the government did not charge Jackson until November 2003, and then only for possession of a prohibited object, the shank used to stab Brown. That charge was dismissed without prejudice in February 2004. In April 2005, the government charged Jackson again, this time for capital murder and possession of a dangerous weapon. He finally received a trial in October 2006 and was convicted a month later.

Jackson argues that the delays violated his Fifth Amendment right to due process. In the alternative, he claims that the case should be remanded for a hearing with discovery on the government's motives for the delays.

A panel of this circuit recently addressed both arguments in Gulley's appeal, United States v. Gulley, 526 F.3d 809, 819-20 (5th Cir. 2008), cert. denied, 77 U.S.L.W. 3201 (U.S. Oct. 6, 2008). The Gulley panel noted that under Fifth Circuit law, the defendant bears the burden of proving that the pre-indictment delay caused "substantial, actual prejudice" and was "intentionally undertaken by the government for the purpose of gaining some tactical advantage over the accused . . . ." Id. at 820 (quoting United States v. Crouch, 84 F.3d 1497, 1514 (5th Cir. 1996) (en banc)). To demonstrate prejudice, "the defendant must offer more than mere speculation of lost witnesses, faded memories or misplaced

documents; he must show an actual loss of evidence that would have aided the defense and that cannot be obtained from other sources." Id. (citation omitted).

The panel noted that district courts should usually "carry a motion to dismiss for pre-indictment delay with the case, and make the determination of whether actual, substantial prejudice resulted from the improper delay in light of what actually transpired at trial." Id. (quoting Crouch, 84 F.3d at 1516). Because the defendant must prove both bad faith and prejudice, a court need not hold a hearing on the government's motives for the delay where the court has determined that no prejudice resulted from it. Id.

The primary question, then, is whether the district court clearly erred in ruling that Jackson "is unable to show that the delay has caused an actual, substantial prejudice to his defense at this point in time." To demonstrate prejudice, Jackson argues that (1) there is a "potential witness who remains unfound" that could have impeached a government witness; (2) there are missing video tapes that might have exculpatory information; (3) there was a "summit" among groups in prison that could have produced more witnesses for the defense; and (4) his mother died, thereby depriving him of her testimony at sentencing.

The first three proffered examples of prejudice are nothing "more than mere speculation of lost witnesses, faded memories or misplaced documents" and do not demonstrate "an actual loss of evidence that would have aided the defense and that cannot be obtained from other sources." Id. On appeal, Jackson provides no information about the "potential witness," whom that witness could have impeached, or how.[2] Jackson also has yet to produce evidence that the vid

---

[2] Jackson gives no citations to this information in the trial record. See FED. R. APP. P. 28(a)(9)(A) (noting need to include "contentions and the reason for them, with citations to the (continued...)

eo tapes ever existed or that the "summit" actually occurred, nor has he adequately explained why these pieces of evidence were important beyond non-specific explanations that they "could easily have yielded more witnesses, more connections, [and] more depth to the understanding of this incident." "[B]ecause actual, substantial prejudice to the defense at trial is required, a showing of mere potential or possible trial prejudice does not suffice." Crouch, 84 F.3d at 1523 (emphasis omitted).

The final proffered prejudice is more plausible. The fact that Jackson's mother died and thus could not testify is not as speculative as his other examplesSSwe at least know who she is and that she existed. He has not explained, however, what testimony she could have offered. Instead, in the motion to the district court and his brief on appeal, he indicates only that his mother was "the one witness whose testimony may have caused the jury to spare [his] life." He does not give any hint as to what her testimony would have been, let alone demonstrate that other, available witnesses could not have provided the same information.[3]

The district court therefore did not clearly err when it concluded that Jack-

---

[2] (...continued)
authorities and parts of the record on which the appellant relies").

[3] Jackson's mother presumably would have testified regarding Jackson's background and upbringing, but Jackson presented other witnesses on that same topic, including a childhood friend who had personally witnessed much of the abuse Jackson suffered. And although Jackson suggests that his mother could have effectively pleaded for her son's life, the district court properly ruled that general pleas for mercy would not be permitted. See Kelly v. Lynaugh, 862 F.2d 1126, 1133 n.12 (5th Cir. 1988) (noting that stepfather's request that jury spare defendant's life is not mitigating evidence required to be admitted under Eighth Amendment); see also Jackson v. Dretke, 450 F.3d 614, 617-18 (5th Cir. 2006) (holding that state court's decision to exclude execution impact testimony by defendant's family and friends did not contradict Supreme Court governing law and was not unreasonable application of Supreme Court precedent).

son was not prejudiced by the prosecution's delay. There was no need for an evidentiary hearing.

Jackson also argues that the delays violated his Sixth Amendment right to a speedy trial, because he did not receive a trial until nearly three years after his 2003 indictment. He concedes, however, that any delay caused by his own requests for continuances should be discounted. According to Jackson, then, the relevant delay for Sixth Amendment purposes runs from November 2003, the date of his initial charge, to July 2005, the date of his first request for a continuance.

The Sixth Amendment protects the right of "the accused . . . to a speedy and public trial." U.S. CONST. amend. VI. This protection attaches when "the defendant has been formally indicted or actually restrained accompanying arrest." Dickerson v. Guste, 932 F.2d 1142, 1144 (5th Cir. 1991). Additionally, the period between a withdrawn indictment and a reindictment does not count for Sixth Amendment purposes. Instead, "when no indictment is outstanding, only the actual restraints imposed by arrest and holding to answer a criminal charge . . . engage the particular protections of the speedy trial provision of the Sixth Amendment." United States v. Loud Hawk, 474 U.S. 302, 310-11 (1986) (citations and internal quotations omitted).

We evaluate speedy trial claims by considering four factorsSSthe length of delay, the reason for the delay, the defendant's assertion of the right, and the prejudice to himSSin a two-step process. At the first step, we examine the length of the delay, which is "to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." Barker v. Wingo, 407 U.S. 514,

530 (1972). "A delay of less than one year will rarely qualify as 'presumptively prejudicial' for purposes of triggering the Barker inquiry." Cowart v. Hargett, 16 F.3d 642, 646 (5th Cir. 1994) (concluding that where prejudice could not be presumed, "we need not even consider the other factors in order to deny [defendant]'s speedy trial claim"). If the delay raises a presumption of prejudice, we move to the second step, at which "the length of the delay, the reason for the delay, and defendant's diligence in asserting his or her rights is weighed against the prejudice to the defendant." United States v. Bergfeld, 280 F.3d 486, 488 (5th Cir. 2002) (citation omitted).

Because Jackson did not suffer a prejudicial delay, his Sixth Amendment claim fails to pass the threshold inquiry. We note that the government vigorously disputes that Jackson's first indictment triggered his speedy trial right. We need not resolve that disagreement, however, because even assuming the first indictment is the correct triggering date, Jackson cannot demonstrate presumptively prejudicial delay.

The first indictment was withdrawn in February 2004, and from then until the second indictment, Jackson was not subject to any "actual restraints imposed by arrest and holding to answer a criminal charge," Loud Hawk, 474 U.S. at 310, in connection with Brown's murder.[4] Jackson has therefore suffered, at most, six months of delay: three months from November 2003 through February 2004 and three months from April 2005 through July 2005. A six-month delay is too short to raise a presumption of prejudice.[5]

---

[4] He was held on unrelated matters, including an arrest for bank robbery.

[5] See, e.g., United States v. Maizumi, 526 F.2d 848, 851 (5th Cir. 1976) (finding that a delay of 10½ months was not presumptively prejudicial).

Further, as already discussed, the district court did not clearly err when it concluded that Jackson suffered no prejudice during the entirety of the prosecutorial delay. The court therefore had no obligation to conduct an inquiry into other Barker factors—including the reason for the delay—and properly rejected Jackson's Sixth Amendment claim without holding an evidentiary hearing.

## B.

Jackson makes at least two separate arguments that the FDPA is unconstitutional.[6] First, he submits that the death penalty is cruel and unusual in violation of the Eighth Amendment. Second, he contends that the Fifth and Sixth Amendments require that any non-statutory aggravating factors used to support the death sentence be alleged in the indictment. Neither claim is supported by law.

Jackson concedes that "this Court must reject [the Eighth Amendment] claim based on binding Fifth Circuit precedent . . . ." He is correct.[7]

The claim based on the Fifth and Sixth Amendments is similarly preclud-

---

[6] Jackson appears to raise a third argument that the due process clause is violated where aggravating factors are treated differently from elements of a crime. He neither explains that contention nor cites any law but instead attempts to incorporate arguments made to the district court "by reference as if fully set out for this Court's consideration."

Argument by reference is not permitted; an appellant who requests "the adoption of previously filed legal and factual arguments . . . abandon[s those] arguments by failing to argue them in the body of his brief." Yohey v. Collins, 985 F.2d 222, 224-25 (5th Cir. 1993) (citing FED. R. APP. P. 28(a)(4), now FED. R. APP. P. 28(a)(9), which requires a brief to contain "appellant's contentions and the reasons for them"). This argument—if it even is a separate argument—is waived.

[7] See, e.g., United States v. Jones, 132 F.3d 232, 242 (5th Cir. 1998) ("We are bound by Supreme Court precedent which forecloses any argument that the death penalty violates the Constitution under all circumstances.").

ed.[8] "[I]t [is] neither constitutional nor statutory error for the non-statutory aggravating factors to be omitted from the indictment." United States v. Bourgeois, 423 F.3d 501, 507-08 (5th Cir. 2005).

In response, Jackson argues that Bourgeois is undermined by Cunningham v. California, 549 U.S. 270, 127 S. Ct. 856 (2007), which addressed a California sentencing system whereby most criminal offense statutes prescribed three tiers of punishment; the sentencing judge was required to impose the middle term unless he found aggravating or mitigating circumstances by a preponderance of the evidence. The Court invalidated the arrangement because, under the Sixth Amendment, "[f]actfinding to elevate a sentence . . . falls within the province of the jury employing a beyond-a-reasonable-doubt standard, not the bailiwick of a judge determining where the preponderance of the evidence lies." 549 U.S. at ___, 127 S. Ct. at 870. Jackson claims that "the statutory scheme invalidated in Cunningham is indistinguishable from the FDPA fact-finding and weighing procedures" and that "the FDPA is even more structured, and thus more suspect."

Jackson's reliance on Cunningham is misplaced. The Sixth Amendment deficiencies identified in the California plan are not present in the FDPA. First, the factfinding in the present case was performed by a jury, not a judge. Second, the FDPA requires aggravating factors to be proved beyond a reasonable doubt. 18 U.S.C. § 3593(c). Because Cunningham is not on point and does not under-

---

[8] The government disputes whether this issue was raised in the district court. If it was raised and preserved, we would review the legal question de novo; otherwise, we would review only for plain error. United States v. Vontsteen, 950 F.2d 1086, 1089-90 (5th Cir. 1992) (en banc). We need not decide whether the issue was adequately raised, however, because we affirm even under de novo review.

mine Bourgeois, which remains the controlling authority in this circuit, we reaffirm the constitutionality of the FDPA.

C.

Jackson argues that the court improperly excluded for cause two veniremen, Janice Epps and Barbara Lee. According to Jackson, they were erroneously excluded based on objections to the death penalty that did not affect their ability to serve as jurors.

Under Witherspoon v. Illinois, 391 U.S. 510, 522 (1968), "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Nonetheless, potential jurors may be excused where they have indicated either "(1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt." Id. at 522 n.21.

In Wainwright v. Witt, 469 U.S. 412, 424 (1985), the Court clarified that the "standard is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath . . . . [T]his standard . . . does not require that a juror's bias be proved with unmistakable clarity" (internal quotations omitted). The Court specified, in Uttecht v. Brown, 127 S. Ct. 2218, 2224 (2007), that a trial court removing a potential juror "makes a judgment based in part on the demeanor of the juror,

a judgment owed deference by reviewing courts." Further, "when there is ambiguity in the prospective juror's statements, 'the trial court, aided as it undoubtedly [is] by its assessment of [the venireman's] demeanor, [is] entitled to resolve [the question] in favor of the State.'" Id. at 2223 (quoting Witt, 469 U.S. at 434).

Jackson argues that Epps should not have been excused. Though he acknowledges that "[a]fter stating her position over and over [she] finally just shut down and said she wouldn't vote for death," he contends that her voir dire as a whole demonstrated otherwise and that the prosecutor's badgering led to the statements used to justify her exclusion for cause.

We disagree. In Epps's questionnaire, she answered that "I don't believe I have the right to say if someone should live or die." Under questioning, she admitted that she could accept the death penalty for those that kill children or "for just no reason at all." The court asked for additional questioning as to her ability to follow juror instructions in cases where death might result, which led to her statement that "I would have to vote against the death penalty," and then she was excused.

The court observed Epps's demeanor and heard her answers. Those answers were inconsistent for a time, which alone might have been ground to excuse her. Ultimately, however, she stated that she would not vote for death. In light of the deference owed, the court did not abuse its discretion.[9]

It is just as evident that the district court did not err as to Lee. During government questioning, she agreed that even if the evidence pointed in the direction of a death sentence, she might not be able to vote that way, "because I'm

---

[9] See United States v. Bernard, 299 F.3d 467, 474-75 (5th Cir. 2002) (affirming dismissal of potential juror who indicated on her questionnaire that she did "not feel [she] ha[d] the right to judge whether a person lives or dies" and then wavered during questioning).

not sure if I can live with myself if I do." Later, as with Epps, Lee vacillated somewhat during questioning by the defense. Finally, under instruction to give a yes or no answer, she was asked whether her feelings about the death penalty would substantially impair her ability honestly to answer the questions presented, and she said yes. The district court properly relied on that statement and excused her.

## D.

Before the fight with Jackson began, Brown took off his shirt. Jackson argues that the court improperly allowed a government witness to speculate about what Brown was thinking when he did that.

Jackson sought to demonstrate that he acted in self-defense and that Brown initiated the confrontation by pulling a shank on him. The government contends instead that Brown was unarmed and initiated only a fistfight, from which he attempted to withdraw when Jackson drew his own shank.

The government presented Derric Wilson, a special investigator at the prison, who testified that inmates typically remove their shirts before a fistfight, because otherwise opponents may be able to "grab onto" their clothes. But in a knife fight, Wilson said, "it has been my experience that inmates have typically padded their clothing," with some even going "so far as to improvise protective vests out of newspapers and magazines and make improvised body armor." Jackson objected, saying that was "pure speculation as to what [was] in the mind of an inmate when he takes his shirt off."

Jackson urges that the court abused its discretion in permitting the testimony, which he claims was inadmissible because it was an "unfounded opinion based upon mere conjecture." Alternatively, he contends that if witnesses can-

not testify as to what was in a defendant's mind, they should not be able to say what was in a potential victim's mind.

Wilson's testimony was rationally related to what he observed as a prison official and was helpful for understanding prison fights. He indicated both that he had not observed the yard fight between Brown and Jackson and that his testimony was founded on unrelated investigations he had conducted.[10] Accordingly, his testimony was not "mere conjecture" regarding what Brown was thinking, but rather background information about prison fights that the jury could consider or disregard.

Moreover, a district court may admit testimony about a potential victim's state of mind. "[I]n the ordinary circumstance[,]" we do not permit witnesses to speculate about a "defendant's state of mind or intent," United States v. Chavis, 772 F.2d 100, 107 (5th Cir. 1985), because intent is one of the ultimate issues for the jury. By contrast, the prejudice to a defendant is both less direct and less substantial where a witness is testifying about what someone other than the defendant thought. Therefore, even assuming arguendo that Wilson testified as to Brown's state of mind, the court did not abuse its discretion.

Jackson argues that even if the testimony was admissible, the court erred when it allowed Wilson to testify as a lay witness under Federal Rule of Evidence 701.[11] He claims that some of Wilson's testimony improperly crossed the

---

[10] As Jackson's brief acknowledges, "[t]he government made no effort to connect these other unrelated incidents to either Jackson nor [sic] the deceased."

[11] Rule 701 provides,

> If the witness is not testifying as an expert, the witness' testimony in the
> form of opinions or inferences is limited to those opinions or inferences which are
>
> (continued...)

14

line into expert testimony governed by Federal Rule of Evidence 702.[12]

Jackson did not raise this issue in the district court, so we review only for plain error. To prove plain error, he must "show (1) there was error, (2) the error was plain, (3) the error affected his 'substantial rights,' and (4) the error seriously affected 'the fairness, integrity or public reputation of judicial proceedings.'" United States v. Jones, 489 F.3d 679, 681 (5th Cir. 2007) (quoting United States v. Olano, 507 U.S. 725, 732, 734 (1993)).

The "distinction between lay and expert witness testimony is that lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field." United States v. Sosa, 513 F.3d 194, 200 (5th Cir. 2008) (citations and internal quotations omitted). To be considered expert, testimony must involve more than "common sense or the officer's past experience formed from firsthand observation." Id.

Wilson indicated that his testimony was based on his "investigat[ion of] various assaults and fights with knives and fights with fists[.]" He represented

---

[11] (...continued)
(a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

[12] Rule 702 provides,

>  If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

that he was "familiar with the clothing that inmates typically wear when they're fighting with knives" and "aware of how inmates go about fist-fighting[.]" Based on those predicates, it appears that Wilson testified only as a lay witness drawing from his "past experiences formed from firsthand observation" as an investigative agent. Accordingly, any error in admitting his statements as lay rather than expert testimony was not plain.

### E.

To demonstrate that he acted in self-defense, Jackson tried to introduce Brown's prison disciplinary records into evidence. The district court barred the evidence, ruling that it should be admitted only if Jackson could prove that he had knowledge of the specific acts described by the records. Jackson contends that that ruling was improper and deprived him of the ability to present a complete defense.

Under Federal Rule of Evidence 404(a), character evidence is generally not admissible "for the purpose of proving action in conformity therewith on a particular occasion . . . ." The rules make an exception, however, and permit the introduction of "[e]vidence of a pertinent trait of character of the alleged victim of the crime offered by an accused . . . ." FED. R. EVID. 404(a)(2). Federal Rule of Evidence 405 provides that such a "trait of character" may always be demonstrated to the jury by presenting evidence of the victim's reputation. On the other hand, testimony about "specific instances of conduct" may be used only if the "character or a trait of character of a person is an essential element of a charge, claim, or defense . . . ." FED. R. EVID. 405 (emphasis added).

The district court was correct to limit Jackson's ability to present Brown's disciplinary records. Brown's propensity for violence is a pertinent trait of char-

16

acter, because it supports Jackson's argument that Brown was the first aggressor. Accordingly, the court allowed extensive testimony on Brown's reputation in the prison community.

The disciplinary records that Jackson attempted to introduce, however, involved specific instances of conduct. Under rule 405, such evidence is admissible only if Brown's violent character was "an essential element of [Jackson's] defense." In Gulley, addressing the same issue, we held,

> . . . Brown's prior specific acts were not admissible to prove his alleged propensity for violence. First, as recognized by the Seventh, Eighth, and Ninth Circuits, the plain language of Rule 405(b) limits the use of specific instances of conduct to prove essential elements of a charge or defense. Second, Brown's character was not an essential element of the self defense claim in the "strict sense" because a self defense claim may be proven regardless of whether the victim has a violent or passive character.

Gulley, 526 F.3d at 819 (internal citations and quotations omitted).

Jackson attempts to avoid Gulley by citing Holmes v. South Carolina, 547 U.S. 319, 321 (2006), which addressed the constitutionality of an "evidence rule under which the defendant may not introduce proof of third-party guilt if the prosecution has introduced forensic evidence that, if believed, strongly supports a guilty verdict." The Court noted that evidentiary rules are given wide latitude unless they "infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." Id. at 324 (citation and internal quotations omitted). The Court concluded that the evidentiary rule was unconstitutional, because it was "arbitrary in the sense that it does not rationally serve the end that the . . . rule[ was] designed to further." Id. at 330-31 (internal quotations omitted).

17

Jackson does not argue with any specificity why rules 404(a) and 405 are "disproportionate" or "arbitrary," "i.e., [that they are] rules that exclude[] important defense evidence but that [do] not serve any legitimate interests." Id. at 325. By limiting the admissibility of specific acts, rules 404 and 405 serve the legitimate interest of ensuring that juries do not acquit or convict on impermissibly prejudicial grounds, but those rules allow limited exceptions where more context is necessary in the interest of justice.[13] This careful balance is hardly disproportionate or arbitrary, and Jackson provides no argument to the contrary beyond assertion.

Jackson also claims that the government "opened the door" to the records. Defense witness Darrell Evans, one of Jackson's fellow inmates, testified that Brown "always have big knives and it be hanging out of his pocket . . . ." On cross-examination, the government expressed some skepticism and asked, "Are you saying that if you're walking around with a shank hanging out of your pocket, that a guard is not going to notice that?" Based on that question, Jackson again sought to admit the disciplinary records, this time to rebut the impression that "Brown did not possess shanks because the guards did not notice it."

This argument is equally unavailing. First, the witness immediately clari-

---

[13] As the advisory committee notes to rule 405 explain,

> Of the three methods of proving character provided by [rule 405], evidence of specific instances of conduct is the most convincing. At the same time it possesses the greatest capacity to arouse prejudice, to confuse, to surprise, and to consume time. Consequently the rule confines the use of evidence of this kind to cases in which character is, in the strict sense, in issue and hence deserving of a searching inquiry. When character is used circumstantially and hence occupies a lesser status in the case, proof may be only by reputation and opinion. These latter methods are also available when character is in issue.

FED. R. EVID. 405 advisory committee's note.

fied his testimony by explaining that the knives would hang out of Brown's pockets only when he was sitting down in his cell, not walking around in plain view of the guards. Second, the court correctly noted that the disciplinary records would not be even arguably relevant unless they demonstrated that the guards had in fact caught Brown with a shank.

Of the records even remotely related to violence,[14] only two came from the prison; one documents an incident in which Brown threw hot coffee on a guard, and the other reports that he threatened to stab a guard. The remaining records came from other prisons, and even there, only two involved shanks. Any relationship between the subject of cross-examination and the proffered evidence was tenuous at best, and the court did not abuse its discretion in excluding it.

## F.

Jackson avers that the district court violated his Sixth Amendment right to counsel when it allowed only the lawyer that had conducted the direct examination of a witness to object during that witness's cross-examination. Because Jackson did not object to that ruling and so did not preserve the issue for appeal,[15] we review only for plain error.

"'Plain' is synonymous with 'clear' or 'obvious,' and at a minimum, contem-

---

[14] The majority of the records describe simple acts of mischief (e.g., falsely triggering fire sprinklers) or insubordination (e.g., refusing to follow instructions from prison officials).

[15] The issue arose when one of Jackson's lawyers, Mr. Barlow, objected during the cross-examination of a witness that Jackson's other lawyer, Mr. Morrow, had directly examined. After questioning was complete and the jury had been excused, the judge ordered, "I don't want one of you objecting and then the other one. That was Mr. Morrow's witness. Mr. Barlow, don't object if he's the person responsible for the witness." Jackson's counsel responded by saying only "Yes, your honor."

plates an error which was clear under current law at the time of trial. . . . Under plain error, if a defendant's theory requires the extension of precedent, any potential error could not have been plain." United States v. Garcia-Rodriguez, 415 F.3d 452, 455 (5th Cir. 2005) (citing United States v. Hull, 160 F.3d 265, 271-72 (5th Cir. 1998)) (internal quotations omitted).

Any error here is not plain. Although Jackson correctly notes that federal law allows him to have two attorneys, he can point to no caselaw that requires both of them to be permitted to object at the same time; instead, Jackson argues for an extension of our existing Sixth Amendment jurisprudence. The government, meanwhile, admits that it can find no authority on the issue; it cites general precedent acknowledging the discretion a district court is afforded to control the trial.[16] Because this is a question of first impression and the law was not obvious at the time of trial, any error was not plain.

## G.

Jackson argues that the district court erred when it forbade him from impeaching government witness Victor Richards with evidence that Richards is a registered sex offender. Richards, an inmate, testified that Jackson and Gulley chased Brown into a cell and stabbed him. In the 1980's, Richards was convicted of sexual assault, sentenced to two years of probation, and required to register as a sex offender.

Federal Rule of Evidence 609 establishes two relevant restrictions relevant

---

[16] The government cites, for example, United States v. Pace, 10 F.3d 1106, 1114 (5th Cir. 1993) (stating that the court of appeals " must determine whether the trial court imposed unreasonable limits on cross-examination such that a reasonable jury might have received a significantly different impression of a witness' credibility had defense counsel pursued his proposed line of cross-examination") (citation and internal quotations omitted).

regarding impeachment by prior criminal convictions. First, under rule 609-(a)(1), the impeachment evidence is subject to Federal Rule of Evidence 403, which says that even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." FED. R. EVID. 403. Second, under rule 609(b), evidence of a conviction may not be used "if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date . . . ." FED. R. EVID. 609(b).

The district court excluded the evidence on both grounds, finding that the conviction was too old and unfairly prejudicial. On appeal, Jackson raises three arguments: First, the conviction's probative value is significant; second, because Richards is still required to register as a sex offender, he has not yet been "release[d] . . . from the confinement imposed"; and third, excluding the impeachment evidence violated Jackson's Sixth Amendment right to cross-examine.

Jackson argues the evidence was probative because Richards was "a registered sex offender, a result of his felony conviction[, and so] he likely may also be untruthful." Further, because he was subject to an ongoing legal obligation to register as a sex offender, he might have "potential bias . . . to testify for the government, thereby staying in the 'good graces' of those who could prosecute him should he ever fail to comply with his registration requirements."

As Jackson admits, however, registration as a sex offender is a "scarlet letter." So although the jury might have considered Richards more likely to be untruthful if it had known of his conviction, there is a significant danger that it would have instead improperly discounted his testimony because of personal revulsion for sex offenses. Moreover, there was ample reason for the jury to find

Richards untrustworthy without introducing the prejudicial evidenceSSthe jury already knew that (1) Richards had been convicted of several other crimes (including burglary and theft); (2) he was currently in prison for a 1999 bank robbery; (3) the government would attempt to get his bank robbery sentence reduced in exchange for his testimony; and (4) he had a history of mental issues and drug abuse. Given the potentially severe prejudice that could have resulted from admitting the conviction and its mostly cumulative probative value, the district court did not abuse its discretion.[17]

The court also did not commit constitutional error. Evidentiary rules generally are upheld unless they "infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve" (citation and internal quotations omitted). Holmes, 547 U.S. at 324. "[W]ell-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. See, e.g., FED. R. EVID. 403." Id. at 326 (emphasis added). The decision to exclude the evidence because of its prejudicial value was therefore constitutionally permissible.

## H.

Defense witness Shannon Agofsky testified that Brown had a knife and said he was going to assault Jackson. The government impeached Agofsky under Federal Rule of Evidence 609 with evidence that Agofsky had been convicted of two counts of capital murder. Agofsky's case has an unusual procedural his-

---

[17] Because we affirm the decision to exclude the evidence as unfairly prejudicial under rule 403, we need not address its ruling that the conviction was too old to be admissible under rule 609(b).

tory, however, that leads Jackson to question whether Agofsky was improperly impeached with non-final convictions.

Agofsky's convictions for capital murder were the result of a single killing. In July 2006, in United States v. Agofsky, 458 F.3d 369 (5th Cir. 2006), we held that the Double Jeopardy Clause forbade convicting Agofsky of both counts, because the charges amounted to the same offense.[18] Id. at 371-72. We nonetheless concluded that one of the two death sentences could stand. Id. at 372-73. Accordingly, we vacated the convictions "to prevent double jeopardy" and remanded with instruction to impose, "at the Government's election, a guilty verdict and death sentence for either Federal Murder or Murder by a Federal Prisoner." Id. at 375.

Agofsky petitioned for writ of certiorari; because of the pending petition, the Fifth Circuit stayed the mandate in August 2006. After the Court denied certiorari in January 2007, Agofsky v. United States, 127 S. Ct. 1149 (2007), the Fifth Circuit lifted the stay of the mandate, which finally issued in February 2007. Agofsky testified at Jackson's trial in October 2006SSafter the Agofsky panel had rendered its opinion but before the Court denied certiorari and the mandate issued.

On appeal, Jackson argues that Agofsky should not have been impeached with either conviction. The question now is whether, at the time of the impeachment, Agofsky had two convictions (per the original district court verdict), zero convictions (per the panel order vacating the convictions), or one conviction (per the instruction that the district court reimpose one of the two original convic-

---

[18] He was convicted of both premeditated, first degree murder and premeditated, first degree murder by a federal prisoner serving a term of life imprisonment.

23

tions on remand). We conclude that he was correctly impeached with both convictions.

This court's decisions are "not final until we issue a mandate." Charpentier v. Ortco Contractors, 480 F.3d 710, 713 (5th Cir. 2007). In Charpentier, we rejected the argument that an award ceased to exist "on the date we issued our opinion [vacating the award]." Id. Similarly, Agofsky's convictions did not cease to exist when the panel opinion vacating them was entered. Because the mandate had not yet issued, the original district court judgment remained in effect; Agofsky was still convicted of both crimes at the time of his testimony.[19]

Further, under rule 609(e), "[t]he pendency of an appeal therefrom does not render evidence of a conviction inadmissible." Accordingly, neither the stayed mandate in this court nor the pending certiorari petition[20] affected the admissibility of Agofsky's convictions.[21] We note, however, that the rules permitted

---

[19] The existence of the convictions did not automatically make them admissible. Rule 609(a)(1) states that convictions for crimes that do not involve acts of dishonesty are admissible subject to rule 403, which allows the district court to exclude evidence where the "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." FED. R. EVID. 609(a)(1). Because Jackson did not raise a rule 403 challenge at trial or on appeal, we do not review the district court's decision on the matter.

[20] In Agofsky's case, the Supreme Court was acting as an "appellate" court. See U.S. CONST. art. III, § 2. Agofsky's certiorari petition is therefore included in rule 609(e)'s reference to "pendency of an appeal."

[21] Jackson argues that the "obvious purpose" of rule 609(e) is to respect the "presumption of correctness which ought to attend judicial proceedings" and that that purpose is not served by respecting a conviction that a court of appeals has reversed while certiorari is pending. That argument is unavailing under the peculiar circumstances of this case.

Agofsky's conviction was not reversed on the meritsSSindeed, the district court was ordered to re-enter the conviction on one count. Further, rule 609(e) is pellucid, and we must follow it. "It is well established that when the statute's language is plain, the sole function of the courtsSSat least where the disposition required by the text is not absurdSSis to enforce it
(continued...)

Jackson to present information about Agofsky's appeal to ameliorate the impeachment. FED. R. EVID. 609(e) ("Evidence of the pendency of an appeal is admissible."). Jackson declined to do so despite being reminded of the option by the district court.

## I.

Jackson argues that, as a matter of constitutional right, he should have been allowed to submit a statement of allocution to the jury.[22] The district court denied Jackson's request to allocute, citing United States v. Hall, 152 F.3d 381, 396 (5th Cir. 1998) ("We conclude that a criminal defendant in a capital case does not possess a constitutional right to make an unsworn statement of remorse before the jury that is not subject to cross-examination."), abrogated on other grounds by United States v. Martinez-Salazar, 528 U.S. 304 (2000).

Jackson's brief does not even mention Hall, let alone attempt to distinguish it. This panel may not overrule the decision of a prior panel. Teague v. City of Flower Mound, 179 F.3d 377, 383 (5th Cir. 1999). Accordingly, we follow Hall and uphold the district court's order.

## J.

---

[21] (...continued)
according to its terms." Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004) (internal quotations and citations omitted); see also, e.g., Garcia v. Gloor, 618 F.2d 264, 268 (5th Cir. 1980) ("[W]e start with [the statute's] plain words without pausing to consider whether a statute differently framed would yield results more consonant with fairness and reason.").

[22] A statement of allocution is "[a]n unsworn statement from a convicted defendant to the sentencing judge or jury in which the defendant can ask for mercy, explain his or her conduct, apologize for the crime, or say anything else in an effort to lessen the impending sentence." BLACK'S LAW DICTIONARY 83 (8th ed. 2004).

Jackson contends that the district court violated his Eighth Amendment rights when it failed to instruct the jury at sentencing that if it had "residual doubts" about his guilt, it should not sentence him to death. Binding Supreme Court precedent, however, forecloses this argument.

In Franklin v. Lynaugh, 487 U.S. 164, 174 (1988), Justice White, writing for four Justices, first noted that "[t]his Court's prior decisions, as we understand them, fail to recognize a constitutional right to have [residual] doubts considered as a mitigating factor."[23] Even if the Eighth Amendment guaranteed such a right, mere denial of a jury instruction did not impair the right, because the "trial court placed no limitation whatsoever on [defendant]'s opportunity to press the 'residual doubts' question with the sentencing jury." Id. The Court also rejected the argument that jurors needed to be told they could consider residual doubt. Accordingly, "even if petitioner had some constitutional right to seek jury consideration of 'residual doubts' about his guilt during his sentencing hearingSS a questionable propositionSSthe rejection of petitioner's proffered jury instructions did not impair this 'right.'" Id. at 175 (emphasis added). Justice O'Connor, for herself and Justice Blackmun, went further and wrote that "the Eighth Amendment does not require [consideration of residual doubt by the sentencing body]." Id. at 187.

The Fifth Circuit has also addressed the issue. Although there is a "difference between rules relating to what mitigating evidence the jury may consider

---

[23] The Court recently reiterated this aspect of Franklin in Oregon v. Guzek, 546 U.S. 517, 525 (2006). The Guzek Court, noting that "Franklin did not resolve whether the Eighth Amendment affords capital defendants such a right [to consideration of residual doubt]," concluded that "we once again face a situation where we need not resolve whether such a right exists . . . ." Id.

and rules relating to instructing the jury how to consider such evidence," a criminal defendant is "not constitutionally entitled to instruct the jury to consider . . . residual doubt . . . ." Smith v. Black, 904 F.2d 950, 968-69 (5th Cir. 1990), vacated on other grounds, 503 U.S. 930 (1992).

We find no error in the denial of Jackson's request for a jury instruction on residual doubt. First, neither the Supreme Court nor the Fifth Circuit has held that a defendant is entitled to such an instruction.[24] Second, even if we assume some right to consideration of residual doubt, the "trial court placed no limitation whatsoever on [Jackson]'s opportunity to press the 'residual doubts' question with the sentencing jury." Jackson was able to argue self-defense at sentencing, and the court explicitly instructed the jury that it could consider "[a]ny other[ factors] you may find from the evidence" and "anything else about the commission of the crime . . . that would mitigate against imposition of the death penalty." Following Franklin and Smith, we therefore conclude that any right to consideration of residual doubt was not impaired.

## K.

As part of rendering its sentencing verdict, the jury completed a special verdict form that included an extensive sixty-item list of potential mitigating factors. Only one of those factors was found by all twelve jurors,[25] and fifty of them received zero support.

---

[24] The lengthy list of cases that Jackson cites suggest, at most, that a defendant is permitted to argue residual doubt. None stands for the proposition that the Eighth Amendment compels a jury instruction on residual doubt.

[25] Factor #15: "[Jackson] had no positive role model in his life as a child and this factor is mitigating."

Jackson argues that the verdict is inconsistent with the evidence presented at trial. He claims that in one case, the verdict contradicted an explicit government stipulation. Elsewhere, he claims that the jury failed to find factors that had been demonstrated at trial "beyond all doubt." He concludes that "[n]o rational juror could have viewed the evidence and then answered the questions regarding the mitigating factors in such a manner without violating his oath as a juror."

As an initial matter, we have expressed doubt that a special verdict on mitigating factors is reviewable.[26] "Assuming, arguendo, that we possess the authority to review the jurors' special findings regarding mitigating factors, we must accept the jurors' factual determinations unless no reasonable juror could have arrived at the conclusion reached by the juror in question." Hall, 152 F.3d at 413. Further, verdict inconsistencies are generally tolerated. See Agofsky, 458 F.3d at 375.[27]

---

[26] See United States v. Hall, 152 F.3d 381, 413 (5th Cir. 1998) ("[W]e question whether the jurors' failure to find a particular mitigating factor constitutes a proper subject of review for this court."), abrogated on other grounds by United States v. Martinez-Salazar, 528 U.S. 304 (2000); see also United States v. Bernard, 299 F.3d 467, 485 (5th Cir. 2002) ("This court has previously expressed doubt regarding its authority to review jury findings relating to mitigating factors. [United States v.] Hall questions whether a jury's failure to find the existence of a mitigating factor is subject to appellate review, since the FDPA does not require the jury to make special findings of the existence of, or degree of jury unanimity upon, mitigating factors.") (internal citation omitted).

[27] As explained in United States v. Powell, 469 U.S. 57, 67 (1984),

[W]ith few exceptions [involving crooked members of the venire panel or improper outside influences on the jury during trial], once the jury has heard the evidence and the case has been submitted, the litigants must accept the jury's collective judgment. Courts have always resisted inquiring into a jury's thought processes; through this deference the jury brings to the criminal process, in addition to the collective judgment of the community, an element of needed finality.

(continued...)

Jackson's strongest claim that the verdict is inconsistent involves Gulley. The government stipulated that Gulley did not receive the death penalty, but on the special verdict form, only one juror found that to be a proven mitigating factor. Jackson argues that in making that finding, "[e]leven of the twelve jurors found an uncontroverted, stipulated, written in stone fact, not to be a fact."

Jackson's argument overstates his case. The special verdict form asked whether the jury found that "[a]n equally culpable defendant, Arzell Gulley, did not receive a sentence of death as a result of the offense" (emphasis added). The government stipulated only that Gulley did not receive a sentence of death; the jury, meanwhile, could have rationally concluded that he was not equally culpable. Jackson testified that Gulley "didn't help me kill the man" and in fact yelled "[l]et's get out of here" after the first stab. Thus, the jury's finding is neither inconsistent with the government's stipulation nor irrational.

The other findings that Jackson cites as inconsistent all relate to factors that the government did not stipulate to be true, e.g., Jackson's head injury as a baby, low I.Q. score, possible retardation,[28] bad home life, good behavior in prison, and diligence in teaching himself to read. Jackson argues that "the evidence overwhelmingly established those factors without controversion by the government."

---

(...continued)
(Internal citations omitted.) The case Jackson cites repeatedly as contrary persuasive authority, Getsy v. Mitchell, 456 F.3d 575 (6th Cir. 2006), was vacated by the en banc court, Getsy v. Mitchell, 495 F.3d 295, 300, 309 (6th Cir. 2007) (en banc) (noting that "[p]erhaps some day the Supreme Court will hold that . . . inconsistent verdicts . . . are unconstitutional[, b]ut this is not the law of the land today . . ."), cert. denied, 128 S. Ct. 1475 (2008).

[28] Jackson alludes to Atkins v. Virginia, 536 U.S. 304 (2002) (barring executions of the mentally retarded), but he does not make an Atkins claim.

This mitigation evidence, however, could rationally be called into question. Much of it was provided by Jackson's childhood and current girlfriend, whom the jury was free to disbelieve,[29] and the government used cross-examination to cast doubt on the reliability of Jackson's expert witnesses. Likewise, despite Jackson's claims to good behavior and educational achievement, the jury, upon learning that he ran a gambling operation in prison, reasonably could have concluded that his rehabilitation was not going well.

Further, and more fundamentally, the jury was not required to find that a factor was mitigating, even if it believed the factor's factual predicate to be true. All the law requires is that jurors be aware that they can consider a factor to be mitigating. See Bernard, 299 F.3d at 485-86. For example, no juror found that Jackson "experienced persistent falling when trying to walk until he was 5 years old and this factor is mitigating." In reaching that conclusion, the jurors could have believed Jackson experienced problems walking but that the factor did not weigh against a sentence of death.

The jury did not merely rubber-stamp the prosecution's request for a death sentence. Four jurors found that Jackson's father was abusive and that the abuse was mitigating. Every juror found it mitigating that Jackson had no positive role model. Six found it mitigating that he was in prison for a non-violent offense. Ten found it mitigating that he was not actively looking to kill someone. Nine found it mitigating that he was the first aggressor. Eight found it mitigating that there are prisoners with worse records who are not sentenced to

---

[29] See, e.g., Hall, 152 F.3d at 413 ("In support of his claim that he experienced an upbringing that militated against the imposition of the death penalty, Hall offered only the testimony of two of his family members, which the jury was free to believe or disbelieve.") (emphasis added).

death.

In short, the jurors appear to have properly and conscientiously carried out their duties. We cannot conclude that their findings are beyond the bounds of reason or are inconsistent with the government's stipulations.

L.

Jackson argues that the court erred in denying him a new trial or at least a hearing regarding his new trial motion. He contends the jury erroneously believed that even if he were sentenced to life without parole, it was still possible he could be released before the end of his lifeSSdespite the district court's explicit instruction to the contrary. To support this contention, Jackson offered an affidavit of an investigator who contacted jurors after the trial. The affidavit stated that a number of them believed that Jackson could be released early, as had happened with a cooperating witness who testified at trial.

A juror's affidavit "may not be received on a matter about which the juror would be precluded from testifying." A juror may testify regarding only three aspects of the events surrounding deliberations: "(1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form." FED. R. EVID. 606(b) (emphasis added).

In United States v. Jones, 132 F.3d 232, 245-46 (5th Cir. 1998), a death penalty case like Jackson's, we unambiguously stated that "[r]ule 606(b) has consistently been used to bar testimony when the jury misunderstood instructions" and that "'outside influence' refers to a factor originating outside of normal court-

room proceedings which influences jury deliberations, such as a statement made by a bailiff to the jury or a threat against a juror" (emphasis added). Jones is on point,[30] and the proffered affidavit should not be received. The affidavit does not provide evidence that "extraneous prejudicial information was improperly brought to the jury's attention" or that "any outside influence was improperly brought to bear upon any juror." At most, it indicates that some jurors apparently misunderstood what Jackson concedes was the court's explicit instruction. Any misunderstanding was seemingly caused by the testimony of a government witness, which came as a valid part of his direct examination during "normal courtroom proceedings."

Because the investigator's affidavit was inadmissible, and Jackson presented no other evidence of jury confusion, the district court was well within its discretion to deny a new trial. Moreover, given that Jackson had not proffered any admissible evidence, the court properly denied the motion to hold an evidentiary hearing.[31]

---

[30] To avoid the impact of Jones, Jackson mischaracterizes the order denying a new trial as a misstatement of the law. He seizes on the court's statement that "because the jury charge did not directly address or even allude to the possibility of future sentence reductions, the jury cannot be accused of explicitly disregarding the court's instructions . . . ." He argues that the court incorrectly focused on the correctness of its instructions rather than the jury's violation of them.

Jackson overlooks the final sentences in the paragraph, in which the court properly explained it was concerned only with influences external to the trial: "Moreover, so long as any misunderstanding regarding the jury charge was not the result of an improper outside source or extraneous influence, the district court need not grant a new trial" (citing Jones, 132 F.3d at 245-46). The court then explained that Jackson had failed to offer any evidence that showed that the jury's erroneous understanding of what life without parole meant had originated outside of the trial.

[31] See, e.g., Tanner v. United States, 483 U.S. 107, 127 (1987) ("[T]he District Court did
(continued...)

For the reasons stated, we AFFIRM the conviction and sentence.

---

[31] (...continued)
not err in deciding, based on the inadmissibility of juror testimony and the clear insufficiency of the nonjuror evidence offered by petitioners, that an additional post-verdict evidentiary hearing was unnecessary.").