# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 6, 2012

No. 11-40039

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee

v.

JUAN PABLO HINOJOSA, also known as Gordo; RAUL GALINDO, also known as Lucky; JOSE ARMANDO GARCIA, JR., also known as Mando, also known as Mandio,

Defendants–Appellants

Appeals from the United States District Court
for the Southern District of Texas
USDC No. 7:07-CR-231-7

Before KING, WIENER, and HAYNES, Circuit Judges.

PER CURIAM:[*]

Defendants–Appellants Juan Pablo Hinojosa, Jose Armando Garcia, Jr., and Raul Galindo were charged with various racketeering and witness tampering offenses in connection with three murders committed on behalf of the Texas Syndicate, a gang in which all three are members. Defendants were convicted on their respective counts after a jury trial and now appeal their

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-40039

convictions on speedy trial, sufficiency of the evidence, confrontation, and jury instruction grounds.  We AFFIRM their convictions.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Defendants–Appellants Juan Pablo Hinojosa ("Hinojosa"), Jose Armando Garcia, Jr. ("Garcia"), and Raul Galindo ("Galindo") (collectively, "Defendants") appeal their convictions on a range of offenses following a jury trial.  Defendants were alleged to be members of the Texas Syndicate, a prison gang that has operated both in and outside of Texas correctional facilities since at least 1989.

On March 27, 2007, the United States brought a four count indictment against nine alleged members of the Texas Syndicate, including Hinojosa and Garcia.  The indictment alleged that the Texas Syndicate was a criminal organization that engaged in widespread criminal activity, including drug trafficking and murders, constituting a pattern of racketeering activity.  Hinojosa and Garcia were each, along with six codefendants, charged with one count of conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d).  Hinojosa's charge came in connection with the murder of Miguel Elizondo, a Texas Syndicate member targeted for killing by the gang, and the attempted murder of Marisa Elizondo, Elizondo's wife.  Garcia was charged in connection with the murder of Crisantos Moran, a Texas Syndicate member who failed to carry out an assigned murder.

On June 4, 2008, the Government filed a superseding indictment adding six additional counts and naming four new defendants, including Galindo.  Hinojosa and Garcia were, in addition to their RICO conspiracy charges, each charged with one count of violating the Violent Crimes in Aid of Racketeering Activity Act ("VICAR"), 18 U.S.C. § 1959(a)(1) (based on murder).  Hinojosa was also charged with a second VICAR count under 18 U.S.C. § 1959(a)(5) (based on attempted murder).  Galindo was charged with a VICAR count, 18 U.S.C. § 1959(a)(5), as well as one count of witness tampering, 18 U.S.C. § 1512(a)(1)(A),

No. 11-40039

in connection with the murder of Marcelino Rodriguez, a confidential informant who was killed on July 8, 2007, shortly after the return of the original indictment. A second superseding indictment followed on November 6, 2008, changing Galindo's VICAR count from § 1959(a)(5) (attempted murder) to § 1959(a)(1) (murder). Defendants were convicted by the jury on all counts. We analyze the appeals grouped by Defendant below.

## A. Hinojosa's Appeal

Hinojosa appeals his convictions for conspiring to violate RICO, 18 U.S.C. § 1962(d), and for violating VICAR, 18 U.S.C. §§ 1959(a)(1) and (a)(5). He contests his convictions on speedy trial, sufficiency-of-the-evidence, and confrontation grounds.

### 1. Facts

Hinojosa's convictions were based on the murder of Miguel Elizondo and the attempted murder of Marisa Elizondo. The Government's case against Hinojosa was built on the testimony of several witnesses. The Government called Javier Solis ("Solis"), a former Texas Syndicate member, who testified that the Dallas branch of the Texas Syndicate had met and voted to order the murder of Miguel Elizondo ("Elizondo"), a Texas Syndicate member, who mishandled a drug deal. Solis explained that the Dallas branch asked the Rio Grande Valley branch to carry out the killing because of police pressure on the Dallas branch.

Juan Vasquez ("Vasquez"), the head of the Rio Grande Valley chapter, testified that after receipt of the request from the Dallas branch, the Rio Grande Texas Syndicate also voted to kill Elizondo. He recalled that after the vote, Hinojosa, who was in attendance at the meeting, volunteered to carry out the murder. Vasquez testified that the Rio Grande Valley branch then invited Elizondo to move down to the Valley in order to facilitate the murder. On the day of the murder, May 19, 2003, Hinojosa requested and received a gun from

No. 11-40039

Vasquez. Vasquez also testified that later that day, Hinojosa told him that he and his accomplice, codefendant Benjamin Piedra ("Piedra"), had killed Elizondo.

Piedra and Ms. Elizondo provided further details on the murder itself. Piedra testified that Hinojosa took him along to kill Elizondo, the plan being to have Piedra distract Ms. Elizondo by asking her to take him to the restroom so that Hinojosa could carry out the murder. Hinojosa and Piedra drove to the Elizondos' house in a blue Jetta. Piedra testified that shortly after he and Hinojosa arrived at the Elizondos' residence, Hinojosa and Elizondo began to converse on the porch just outside of the open front door. After a few minutes, Piedra entered into the residence with Ms. Elizondo and then heard two gunshots coming from the front of the house. Piedra testified that Ms. Elizondo attempted to flee through the back door of the house, but could not open it and fell. Piedra then tried to fire his weapon, but it jammed. Piedra turned and told Hinojosa that the gun was not working and at that moment saw Elizondo lying on the floor. By that point, Ms. Elizondo had fled the residence, and so Hinojosa and Piedra drove around in the blue Jetta seeking her out to no avail. Ms. Elizondo largely confirmed this series of events.

*2. Motion to Dismiss Claim*

Hinojosa first appeals the district court's denial of his motion to dismiss, which was based on the Sixth Amendment right to a speedy trial and Fifth Amendment due process grounds. On or around May 24, 2003, a few days after Elizondo's murder, Hinojosa left the United States and went to Mexico. The State of Texas issued a warrant for Hinojosa's arrest on April 5, 2004. Hinojosa returned from Mexico sometime in December 2005, but went to Alabama, knowing that there had been a warrant issued in Texas for his arrest. He was arrested by state authorities in Alabama on May 4, 2006, and extradited to Texas to face state charges.

No. 11-40039

Hinojosa was indicted on the federal charges at issue in this case on March 27, 2007. Following his indictment, Hinojosa agreed to continuances until August 28, 2008. However, on December 17, 2008, Hinojosa opposed a codefendant's motion for a continuance. Hinojosa subsequently opposed all other motions for continuances. On March 20, 2009, Hinojosa filed a motion to dismiss the charges against him on speedy trial grounds. Hinojosa later filed a supplemental motion to dismiss, again on speedy trial grounds, urging the court to carry out a due process inquiry. On July 24, 2009, the district court held a hearing regarding Hinojosa's motion to dismiss. The court found that Hinojosa was not prejudiced by any delay and denied his motion to dismiss. Hinojosa now appeals this denial.

In challenging the district court's decision, Hinojosa argues that the delay between the filing of charges and the trial harmed him in several ways. First, Hinojosa argues that because of the delay, witnesses who could have assisted him with his defense have either died, gone missing, or have become estranged from him and refuse to testify. Second, Hinojosa alleges that physical evidence, such as bullet holes at the murder scene, may have been lost due to the delay.[1]

We review Sixth Amendment speedy trial claims and Fifth Amendment due process claims de novo for legal conclusions, while we review underlying factual findings for clear error. *United States v. Bishop*, 629 F.3d 462, 465–66 (5th Cir. 2010). "Under the clear error standard, we defer to the findings of the district court unless we are left with a definite and firm conviction that a mistake has been committed." *United States v. Avants*, 367 F.3d 433, 441 (5th Cir. 2004) (citation and internal quotation marks omitted)).

---

[1] Hinojosa also argues that he was denied access to "federal counsel" because of the delay, resulting in him making incriminating statements to federal officers. These statements were excluded from the cases because of a *Miranda* violation and so Hinojosa was unharmed by them.

No. 11-40039

i. Sixth Amendment Claim

The Sixth Amendment right "to a speedy and public trial," U.S. CONST. amend. VI, "attaches when the defendant has been formally indicted or actually restrained accompanying arrest." *United States v. Jackson*, 549 F.3d 963, 971 (5th Cir. 2008) (citation and internal quotation marks omitted). With this right, "'[a] prior state arrest . . . , even if based upon the same operative facts as a subsequent federal accusation, does not trigger the [S]ixth [A]mendment right to a speedy trial.'" *United States v. Green*, 508 F.3d 195, 201 (5th Cir. 2007) (quoting *United States v. Gomez*, 776 F.2d 542, 549 (5th Cir. 1985)). Accordingly, Hinojosa's Sixth Amendment right to a speedy trial attached when he was indicted on March 27, 2007. "A defendant's Sixth Amendment speedy trial claim is evaluated pursuant to a four-factor balancing test considering: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's diligence in asserting her Sixth Amendment right; and (4) any prejudice to the defendant resulting from the delay." *Bishop*, 629 F.3d at 465 (citing *Barker v. Wingo*, 407 U.S. 514, 530–33 (1972)).[2]

On appeal, Hinojosa reiterates arguments he made before the district court, and they remain unpersuasive. Even if the first factor cuts in Hinojosa's favor, see *United States v. Bergfeld*, 280 F.3d 486, 488 (5th Cir. 2002) (explaining that a delay of over a year is generally sufficient to trigger a *Barker* inquiry), the other three go against him. On the second factor—the reason for the delay—Hinojosa joined in or requested at least eight continuances over a period of a year and a half from the return of the indictment. Furthermore, the Government's case was legitimately complex, involving multiple defendants

[2] The first three factors in this test are weighed to see if prejudice against the defendant should be presumed. *United States v. Frye*, 372 F.3d 729, 736 (5th Cir. 2004). If the defendant fails to show that these first three factors tip in his favor, then he must show actual prejudice. *Id.*

6

accused of serious crimes. "'[T]he delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge' such as th[is] one . . . ." *United States v. Bieganowski*, 313 F.3d 264, 284 (5th Cir. 2002) (quoting *Barker*, 407 U.S. at 531); *see also id.* ("This was a complex case, and we hesitate to say that the reasons for the delay were unreasonable. The volume of discovery and the number of defendants involved justified some delay . . . ."). Indeed, even if "the delay [were] wholly unexplained[, which it is not], this factor [would] weigh[] in [Hinojosa]'s favor, but the advantage that [would] accrue[] to him is small." *Amos v. Thornton*, 646 F.3d 199, 207 (5th Cir. 2011) (footnote omitted). Finally, Hinojosa has provided no evidence that any delay was "made to hamper the defense and gain some impermissible trial advantage" for the Government. *Bishop*, 629 F.3d at 467 (citing *Doggett v. United States*, 461 U.S. 647, 656 (1992)).

Likewise, the third factor—Hinojosa's diligence in asserting his Sixth Amendment right—cuts against him. This factor "requires a showing that [Hinojosa] 'manifest[ed] his desire to be tried promptly.'" *United States v. Harris*, 566 F.3d 422, 432 (5th Cir. 2009) (quoting *United States v. Frye*, 489 F.3d 201, 212 (5th Cir. 2007)). "An assertion of [this] right is a demand for a speedy trial, which will generally be an objection to a continuance or a motion asking to go to trial." *Frye*, 489 F.3d at 211. By this standard, Hinojosa only began to demand his Sixth Amendment right roughly a year and a half after the Government brought charges against him. Under similar circumstances, the Fifth Circuit, "lookin[ing] to the totality of proceedings," has found that the third factor weighs against a defendant. *See United States v. Parker*, 505 F.3d 323, 330 (5th Cir. 2007).

The fourth and final factor—prejudice against Hinojosa resulting from the delay—also militates against his claim. To prevail on this factor, Hinojosa must show "actual prejudice." *Frye*, 372 F.3d at 739. An analysis of Hinojosa's claims

reveal that he is unable to do this. First, none of the witnesses that Hinojosa refers to in his brief could have helped him. Hinojosa claims that the delay cost him the testimony of his wife. However, according to his own testimony, Hinojosa and his wife left for Mexico on May 24, 2003, while the Elizondo murder occurred on May 19, 2003. Hinojosa's wife could not, therefore, have provided him with an alibi for the Elizondo murder. Furthermore, in its November 8, 2008, superseding indictment, the Government dropped all drug charges against Hinojosa. Similarly, Hinojosa refers to Sammy Buentello, a Texas Department of Criminal Justice employee who allegedly worked with Hinojosa to end his participation in the Texas Syndicate. However, Hinojosa last had contact with Buentello sometime before 2003, and Hinojosa never actually explains the value of Buentello's testimony. Hinojosa also refers to "[a] Texas Syndicate member who knew Mr. Hinojosa refused to kill . . . Elizondo and was running from Texas Syndicate orders to commit crimes was dead." Apparently, Hinojosa was referring to Marcelino Rodriguez, a Texas Syndicate member whom Galindo killed, but could not further explain what kind of testimony Rodriguez would have offered. Hinojosa also mentions Ms. Elizondo in his brief claiming that "she changed her testimony several times." However, Ms. Elizondo testified at trial, and was available for cross-examination, which Hinojosa did in fact conduct. Finally, Hinojosa claims that because of the delay the memory of Elia Torres, one of only two witness called by Hinojosa at trial, had faded. However, Torres never indicated that her memory had faded during her testimony, and the district court rejected Hinojosa's argument as "speculation."

Hinojosa also claims that the delay cost him the opportunity to gather valuable physical evidence, as the house had changed ownership and subsequent repairs removed any remaining bullet holes and bullets. Hinojosa says little more than this and, as the district court observed, there was no indication as to

whether these repairs were done during the 2003 to 2006 period prior to Hinojosa's indictment or afterwards. Hinojosa also does not explain with any specificity what kind of evidence he would have obtained in the absence of delay or its probative value.

Thus, because Hinojosa cannot show actual prejudice or even the second and third *Barker* factors, we reject his Sixth Amendment claim.

### ii. Fifth Amendment Due Process Claim

"[U]nder Fifth Circuit law, [to make out a Fifth Amendment due process claim] the defendant bears the burden of proving that the pre-indictment delay caused 'substantial, actual prejudice' and was 'intentionally undertaken by the government for the purpose of gaining some tactical advantage over the accused . . . .'" *Jackson*, 549 F.3d at 969 (quoting *United States v. Gulley*, 526 F.3d 809, 820 (5th Cir. 2008)).

As the discussion above shows, Hinojosa has failed to demonstrate that he suffered any prejudice due to the delay. *See Jackson*, 549 F.3d at 970 (rejecting Fifth Amendment due process claim because defendant's "three proffered examples of prejudice are nothing more than mere speculation of lost witnesses, faded memories or misplaced documents and do not demonstrate an actual loss of evidence that would have aided the defense") (citation and internal quotation marks omitted). Furthermore, he has not presented any evidence of bad faith or dilatory tactics on the part of the Government. The case's substantial complexity constituted an adequate non-oppressive reason for the delay. Hinojosa offers nothing to rebut this conclusion and, in fact, the record shows that Hinojosa's absconding to Mexico and then Alabama played a significant role in delaying the indictment. We find, therefore, that Hinojosa is not entitled to relief under the Fifth Amendment.

### iii. Conclusion

No. 11-40039

Hinojosa has failed to make out a viable argument on any of his speedy trial claims.[3] We therefore affirm the district court's denial of his motion.

### 3. Sufficiency of the Evidence Claim

Hinojosa also challenges the evidence supporting his RICO conspiracy conviction, 18 U.S.C. § 1962(d). "A challenge to the sufficiency of the evidence that is procedurally preserved, as this challenge was, is reviewed *de novo*." *United States v. Diaz*, 637 F.3d 592, 602 (5th Cir. 2011). "The 'relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Valle*, 538 F.3d 341, 344 (5th Cir. 2008) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This "review of the sufficiency of the evidence is 'highly deferential to the verdict.'" *United States v. Moreno–Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011) (quoting *United States v. Harris*, 293 F.3d 863, 869 (5th Cir. 2002)). But, "[i]f the evidence tends to give equal or nearly equal circumstantial support to guilt and to innocence . . . reversal is required: When the evidence is essentially in balance, a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Elashyi*, 554 F.3d 480, 492 (5th Cir. 2008) (citation and internal quotation marks omitted).

Our "case law makes clear that the standard of review for sufficiency of circumstantial evidence is the same as it normally would be for direct evidence." *Moreno–Gonzalez*, 662 F.3d at 372 (citation omitted). "[W]hether judges doubt the credibility of a witness, even an accomplice cooperating with the

---

[3] Hinojosa also raises claims under the Speedy Trial Act and Federal Rule of Criminal Procedure 48(a). His Speedy Trial Act argument—that the filing of his motion to dismiss based on speedy trial grounds should not have tolled the statutory period until trial—is without merit. *See United States v. Daychild*, 357 F.3d 1082, 1095 (9th Cir. 2004). Hinojosa has also failed to show any unnecessary delay or that the district court abused its discretion by not exercising its powers under Rule 48(a). *See United States v. Garcia*, 995 F.2d 556, 561 n.8 (5th Cir. 1993).

Government, is beside the point in reviewing . . . sufficiency claim[s] . . . [,] with the exception of cases where a witness'[s] testimony is so incredible or insubstantial that, as a matter of law, we may discredit it. . . . [But] [s]uch cases typically involve testimony about an event that could not have occurred under the laws of nature . . . . The question of [a witness]'s credibility [i]s one for the jury." *United States v. Garcia*, 567 F.3d 721, 731 (5th Cir. 2009) (citations and internal quotation marks omitted)).

Hinojosa argues that there was no evidence showing that he agreed to the Texas Syndicate's objectives. Hinojosa also argues that the indictment failed to produce supporting facts to show that Hinojosa was a member of or affiliated with the Texas Syndicate. Similarly, Hinojosa also contends that the Government failed to show that he was involved in a "pattern of racketeering activity," 18 U.S.C. § 1962(c), since the indictment only stated facts related to the murders of Miguel Elizondo and the attempted murder of Marisa Elizondo. This single allegation, based on a single incident, he asserts, is insufficient to support a RICO conspiracy conviction.

Before reaching the sufficiency question, it is important to note that Hinojosa's argument misstates part of the relevant law. First, Hinojosa conflates the proof requirements for a substantive RICO conviction under 18 U.S.C. § 1962(c) and a RICO conspiracy charge under 18 U.S.C. § 1962(d). "'To prove a RICO conspiracy, the government must establish (1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the overall objective of the RICO offense.'" *United States v. Delgado*, 401 F.3d 290, 296 (5th Cir. 2005) (quoting *United States v. Posada–Rios*, 158 F.3d 832, 857–58 (5th Cir. 1998)). Contrary to Hinojosa's arguments, the RICO statute penalizes "conspir[ing] to violate any of the provisions of subsection (a), (b), or (c)." 18 U.S.C.§ 1962(d). The Government need not prove a violation of §§ 1962(a),(b), or (c) in order to show a RICO

conspiracy. *See Posada–Rios*, 158 F.3d 832, 857 (5th Cir. 1998) (concluding that "[Supreme Court precedent dealing with operation and management of a RICO enterprise] addressed only the extent of conduct or participation necessary to violate a substantive provision of the statute; the holding in that case did not address the principles of conspiracy law undergirding § 1962(d)" (citation and internal quotation marks omitted)).

The proper inquiry is, therefore, whether Hinojosa "knew of and agreed to the overall objective of the RICO offense." *Delgado*, 401 F.3d at 296.   Thus, in reviewing the sufficiency of the evidence to support Hinojosa's conviction under § 1962(d), the question is simply whether there was enough evidence for a rational trier of fact to conclude beyond a reasonable doubt that Hinojosa "knew of and agreed to the overall objective of the RICO offense" underlying the RICO conspiracy count.  *Delgado*, 401 F.3d at 296.   Here, that the standard is met. Contrary to Hinojosa's assertions, the Government presented strong evidence that he was a willing and active member of the Texas Syndicate.  Other Texas Syndicate members reported that Hinojosa attended the gang's meetings and took votes at those meetings.  The leader of the Rio Grande branch of the gang described Hinojosa as a "full-fledged member" of the Texas Syndicate.  Indeed, that witness testified that Hinojosa volunteered to "take the hit" on Miguel Elizondo.  While Hinojosa's counsel impeached this witness's credibility with inconsistent statements he previously gave to law enforcement officers, a rational jury could reasonably find that Hinojosa knew of and agreed to participate in the Texas Syndicate's racketeering activity. *See Garcia*, 567 F.3d at 731 ("The question of [a witness]'s credibility [i]s one for the jury.").

There was more than sufficient evidence to support Hinojosa's RICO conspiracy conviction.  Accordingly, we reject Hinojosa's sufficiency claim.

*4.  Confrontation Claim*

No. 11-40039

Finally, Hinojosa also claims a Confrontation Clause violation based upon on what he perceives to be the district court's decision not to allow him to cross-examine Ms. Elizondo as to an inconsistent statement that she made to the police on the night of her husband's murder. "We review alleged violations of a defendant's Sixth Amendment confrontation right *de novo*. . . . Such claims, however, are subject to harmless error review." *United States v. Skelton*, 514 F.3d 433, 438 (5th Cir. 2008) (citations omitted). "The Confrontation Clause is satisfied where defense counsel has been allowed to expose the jury to facts from which the jury 'could appropriately draw inferences relating to the reliability of the witness.'" *United States v. Davis*, 393 F.3d 540, 548 (5th Cir. 2004) (quoting *United States v. Restivo*, 8 F.3d 274, 278 (5th Cir. 1993)). "If there is no constitutional violation, then we review a district court's limitations on cross-examination for an abuse of discretion, which requires a showing that the limitations were clearly prejudicial." *Skelton*, 514 F.3d at 438; *see also Davis*, 393 F.3d at 548 (explaining that to demonstrate prejudice, "the defendant must show that a reasonable jury might have had a significantly different impression of the witness's credibility if defense counsel had been allowed to pursue the questioning") (citation omitted).

We understand Hinojosa to argue that Ms. Elizondo had previously stated to the police that she did not see Mr. Hinojosa at the scene of the crime, but later changed her testimony at trial and claimed she could see him driving away from the scene within a lighted house into a dark car after dark." Hinojosa also argues that the district court wrongly prevented him from reading to the jury an unsigned statement purportedly given by Ms. Elizondo to the police on the night of the murder in order to impeach her testimony.

Nothing in the record supports Hinojosa's contentions. On cross-examination, Ms. Elizondo testified that she gave a statement to the police on the night of her husband's murder. Over the course of the cross-examination,

13

No. 11-40039

Hinojosa's counsel made repeated reference to this statement and inconsistencies between it and Ms. Elizondo's testimony, questioning her recollection regarding the arrival of the Jetta, what she had actually seen when she looked out onto the street, whether she had ever seen the Jetta before, and whether she saw Hinojosa after her husband had been shot. Moreover, defense counsel elicited Ms. Elizondo's concession that on the night of the shooting, she told the police, "I don't know who shot my husband."

These facts refute Hinojosa's argument. There is no Confrontation Clause violation because Hinojosa's counsel was "allowed to expose the jury to facts from which the jury could appropriately draw inferences relating to the reliability of [Ms. Elizondo]." *Davis*, 393 F.3d at 548 (5th Cir. 2004) (citation and internal quotation marks omitted). Similarly, the district court did not abuse its discretion because defense counsel was allowed to fully cross-examine Ms. Elizondo as to the contents of the statement, even if he was not allowed to read the unsigned police statement to the jury. Defense counsel made no effort to admit the statement into evidence, or authenticate it, or show that it was produced or signed by Ms. Elizondo, or prove that it was a police statement at all. *See* FED. R. EVID. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."). It is also unclear that the jury would have had a "significantly different impression" of Ms. Elizondo's credibility had the document been admitted into evidence, given the scope and depth of her cross-examination. *Davis*, 393 F.3d at 548. Thus, we reject Hinojosa's confrontation claim.

### 5. *Conclusion*

As Hinojosa has failed to make any persuasive arguments for overturning his convictions, we affirm his convictions.

## B. Garcia's Appeal

14

No. 11-40039

Garcia's convictions for violating RICO's conspiracy provision, 18 U.S.C. § 1962(d), and VICAR, 18 U.S.C. § 1959(a)(1), extend from his involvement in the murder of Crisantos Moran.  Garcia challenges his convictions on sufficiency-of-the-evidence and confrontation grounds, and also challenges the jury instructions the district court delivered.

*1. Facts*

On March 20, 2003, Crisantos Moran, a Texas Syndicate member, was murdered.  Garcia had pled guilty to this murder in Texas state court, and was later tried on the federal offenses enumerated above.  At Garcia's federal trial, the Government called codefendant Noel De Los Santos ("De Los Santos") to testify as to the circumstances of Moran's death.  De Los Santos testified that at a March 2003 Texas Syndicate meeting, the gang's leadership discussed the murder of Carlos Salinas, a member of a rival gang.  The task of killing Salinas was assigned to Moran at this meeting.  Garcia and De Los Santos were to accompany Moran and ensure that he killed Salinas.

On March 20, 2003,  Garcia, De Los Santos, and Moran drove to Salinas's house, whereupon Moran exited the vehicle and approached the house.  Moran, however, returned to the car and reported that nobody was at the house.  De Los Santos testified that he interpreted this to mean that Moran did not want to carry out the killing.  He explained that under Texas Syndicate rules, if someone "doesn't do his job, he gets killed," so De Los Santos decided to kill Moran. Garcia drove the car to a secluded field where De Los Santos shot Moran in the head.  Moran fell to the ground, where he lay motionless, and De Los Santos shot him again while he was on the ground.  When asked, "[W]hat did . . . Garcia do?" De Los Santos replied, "He came around and shot him too. . . .  Like six times." The Government also called Mario Garcia, Garcia's brother, to testify as well. He testified that Garcia told him that "Boy [i.e., De Los Santos] had shot and killed him—Moran," and that Garcia "shot [Moran] afterwards when [Moran]

15

was laying down [sic]." The Government also introduced Garcia's guilty plea in Texas court to the murder of Moran.

The final major piece of evidence in the Government's case came from the testimony of the medical examiner, Dr. Fulgencio Salinas. Dr. Salinas opined that Moran "died of multiple gunshot wounds to different parts of the body." Dr. Salinas explained that Moran's corpse had eight gunshot wounds, one of which was to the head. Based on the head wound's characteristics, Dr. Salinas opined that the shooter would have been between six inches and two or three feet away to cause this kind of wound. Dr. Salinas testified that a gunshot wound to head of that type might have caused instantaneous death, but that "sometimes they do and sometimes they don't." Dr. Salinas, however, also observed that there was evidence of a "vital reaction" in the blood vessels surrounding the other gunshot wounds in Moran's body indicating that Moran's heart may have still been pumping after the gunshot to his head when the other wounds were inflicted.

### 2. *Sufficiency of the Evidence Claim*

Garcia challenges the sufficiency of the evidence supporting his Count 1 conviction under RICO's conspiracy provision, 18 U.S.C. § 1962(d). Sufficiency of the evidence challenges are reviewed de novo and in the light most favorable to the jury verdict, focusing on whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Diaz*, 637 F.3d at 602. Garcia argues the Government was required to prove that Mr. Garcia specifically agreed that two of the predicate acts of murder alleged in the indictment would be committed and that the Government failed to carry this burden because there was no evidence that Mr. Garcia knew of or agreed to the murders other than that of Moran.

The RICO conspiracy provision makes it "unlawful for any person to conspire to violate any of the [other] provisions of [this] subsection . . . ." 18

No. 11-40039

U.S.C. § 1962(d).[4]  In this circuit, the Government is not required to prove that the defendant agreed to the commission of two predicate acts.  *See Delgado*, 401 F.3d at 296 ("The conspirator need not have committed or agreed to commit the two predicate acts. . . .  [The conspirator] need only have known of and agreed to the overall objective of the RICO offense." (citing *Salinas v. United States*, 522 U.S. 52, 61–66 (1997)).  Garcia bases his argument on case law from other circuits which varies from this position, without an argument as to why the Fifth Circuit's position should be changed.[5]  *Compare United States v. Driver*, 535 F.3d 424, 432 (6th Cir. 2008) (explaining that under Sixth Circuit precedent, "[a defendant]'s RICO conspiracy conviction can be sustained [only] if there is evidence sufficient to prove that [defendant] agreed that *someone* would commit two predicate acts") (emphasis in original) *with Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 239 n.17 (5th Cir. 2010) ("A defendant need not know exactly what predicate acts the conspiracy intends to perpetrate so long as the defendant knows and agrees to facilitate the 'overall objective' of the conspiracy.").  Thus, Garcia's argument incorrectly elevates the burden of proof on the Government, which was only required to show that Garcia  knew of and agreed to the Texas Syndicate's overall objectives.  It is clear that the Government met this burden at trial.

---

[4] In this case, the conspiracy was to violate 18 U.S.C. § 1962(c), which provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

[5] Moreover, "whatever persuasiveness [the cases Garcia cites] may have, [the] rule of orderliness directs that one panel of this court cannot overrule the decision of another panel." *United States v. Dial*, 542 F.3d 1059, 1060 (5th Cir. 2008) (citation and internal quotation marks omitted).

17

No. 11-40039

In assessing the evidence presented at trial, Garcia contends that the Government was only able to show that he was merely "associated" with the Texas Syndicate, and argues this was insufficient to convict him of RICO conspiracy. To support his argument, Garcia relies on *United States v. Driver*, 535 F.3d 424 (6th Cir. 2008), and *United States v. Posada–Rios*, 158 F.3d 832 (5th Cir. 1998). Neither case supports his position. As discussed above, the Sixth Circuit's test for proving a RICO conspiracy is different from that of this jurisdiction, so Garcia's reliance on *Driver* is misplaced. Moreover, while it is true that the *Posada–Rios* court did conclude that a defendant's "longstanding association" with the drug trade and members of a RICO enterprise by itself could not support a RICO conspiracy conviction, the defendant in that case had merely engaged in failed negotiations to sell drugs to the enterprise. *Posada–Rios*, 158 F.3d at 858. The court concluded that "[a]lthough . . . a conspirator need not know each of his co-conspirators, or the details of the conspiracy, the government's theory in this case stretche[d] too far the outer bounds of RICO conspiracy law." *Id.*

In contrast, Garcia's connection to the Texas Syndicate and his knowledge of its objectives were substantial. Garcia was identified at the trial as having been a Texas Syndicate member for several years. He attended meetings of the gang. The Government introduced testimony from Garcia's own brother that Garcia's victim, Crisantos Moran, had received instructions at a Texas Syndicate meeting to kill a rival gang member and that Garcia's job was to make sure Moran carried out this task. De Los Santos confirmed that both he and Garcia had been ordered to make sure that Moran carried out the murder. Following these orders, Garcia and De Los Santos killed Moran for failing to follow the Texas Syndicate's "rules." This connection goes beyond mere association with the organization.

18

No. 11-40039

Consequently, under the proper Fifth Circuit case law, a rational trier of fact could conclude that Garcia "knew of and agreed to the overall objective of the RICO offense" sought to be perpetrated by the Texas Syndicate. *Delgado*, 401 F.3d at 296. We therefore hold that the evidence was sufficient to support Garcia's RICO conspiracy conviction.

*3. Confrontation Claim*

Garcia also argues that the district court violated his confrontation right by restricting his cross-examination of a Government witness. As noted above, we review Confrontation Clause objections de novo, but subject to harmless error analysis. *United States v. McCormick*, 54 F.3d 214, 219 (5th Cir. 1995). "If there is no constitutional violation, then we review a district court's limitations on cross-examination for an abuse of discretion, which requires a showing that the limitations were clearly prejudicial." *Skelton*, 514 F.3d at 438.

The Government called a former Texas state prosecutor, Kimberly Leo ("Leo"), to testify that Garcia pled guilty to Moran's murder in state court. As part of Leo's direct examination, the Government introduced copies of Garcia's indictment and the judgment of conviction against him as evidence, pursuant to Federal Rule of Evidence 803(22), that Garcia had pled guilty to the murder of Moran in state court. Leo then identified Garcia in court.

On cross-examination, Garcia's counsel brought up the fact that Garcia's plea was the result of a plea bargain and that the sentence for Moran's murder was to run concurrently with other sentences, with the intention of showing that Garcia pled guilty to the murder for a reason other than that he had an intent to kill Moran:

> Q: There is a concurrent agreement to run other cases together; is that right?
>
> A: That is correct.

19

No. 11-40039

Q: Would you agree with me that there's also a consideration that other cases be taken into account; is that right?

A: Yes.

Q: Would you agree with me that those are very important factors in resolving criminal cases that lawyers consider?

The Government objected and the district court upheld the objection on grounds that the line of questioning was not relevant. The district court, however, allowed Garcia to rephrase his question:

Q: Ms. Leo, is it a common practice amongst lawyers—Defense lawyers and prosecutors in State Court—in order to resolve cases, to bring a closure to cases, to enter into agreements where there is [sic] concurrent sentences and cases to be considered as part of an overall package to just bring the case to an end?

A: Yes.

Garcia now appeals the district court's restriction on his cross-examination of Leo. He argues that his motive for entering into the guilty plea was relevant for showing the jury that he may not have intended to kill Moran, even in spite of his guilty plea to the murder.[6]

Here, the constitutional standard is met. The district court allowed Garcia to rephrase his question to make his point that defendants enter into plea agreements including concurrent sentences for reasons other than guilt, like bringing the "case to an end." Garcia's counsel reiterated this exact point in his closing argument:

But I want you to look at that judgment where it says "concurrent sentences." And Ms. Leo testified under cross examination that the reason for concurrent sentences was so those sentences could run

---

[6] Garcia asserts in this regard that the Government was required to prove that he intended to kill Moran, but that testimony at trial indicated that he only shot Moran after his accomplice had already shot him in the head and Moran had fallen motionless to the ground. Accordingly, he argues that he did not intend to kill Moran, but only to shoot Moran's already dead body and avoid punishment at the hands of the Texas Syndicate for failing to carry out orders.

> together with the underlying charge. Basically, this conviction was going to wash itself out because he was going to be eaten up by the other cases that Mr. Garcia was doing time for. That's the reason he pled guilty, because he actually wasn't going to do any time at all in state court for that murder.

While Leo was on the stand, defense counsel asked no further questions regarding Garcia's guilty plea or why he may have agreed to a plea agreement. The record shows that Garcia was permitted to expose the jury to the relevant facts from which they could draw his desired inference, namely, that he may have had an incentive to plead guilty to the murder despite not having intended to kill Moran.

We also find that the district court did not abuse its discretion. Because Garcia was allowed to make his argument, though perhaps not in his preferred way, he cannot claim that the district court's restriction on his line of questioning was clearly prejudicial. Garcia's argument that the Government needed the jury to rely on his guilty plea to establish the element of an intent to kill Moran to obtain a conviction on both counts fails to comport with the record. While it is true that the Government referred to Garcia's guilty plea in its closing statement, as we explained above, the Government also made reference to a range of other evidence supporting its theory. While a jury could have drawn Garcia's preferred inference that he shot Moran's already-dead body only to avoid punishment at the hand of the Texas Syndicate, there was more than enough evidence for a rational jury to conclude that Garcia shot Moran while he was still alive in order to ensure Moran's death. Our review of the record reveals that there is no evidence that the district court's decision to disallow Garcia to further pursue his cross-examination of Leo was clearly prejudicial. We therefore reject Garcia's confrontation argument.

*4. Jury Instruction Claim*

No. 11-40039

Garcia's final point on appeal is that the district court reversibly erred in the jury instructions it delivered. Specifically, Garcia points to instructions that Hinojosa proposed, that he joined in requesting, stating "Your verdict must be unanimous as to which specific racketeering acts you find that the Defendant committed, caused or aided and abetted." Instead, the district court instructed the jury that participation in RICO conspiracy focuses on:

> the Defendant's agreement to participate in the objective of the enterprise, to engage in a pattern of racketeering activity and not on the Defendants agreement to commit the individual criminal acts. The Government must prove that the Defendant participated in some manner in the overall objectives of the conspiracy and that the conspiracy involved or would have involved the commission of two racketeering acts. The Government is not required to prove either that the Defendant agreed to commit two racketeering acts or that he actually committed two such acts, although you may conclude that he agreed to participate in the conduct of the enterprise from proof that he agreed to commit or actually committed such acts.

Thus, Garcia argues on appeal that district court reversibly erred by omitting the requirement that the jury unanimously agree on which two of the various predicate acts alleged by Government Garcia agreed would be committed.[7]

"Because '[d]istrict courts enjoy substantial latitude in formulating a jury charge,' we review 'all challenges to, and refusals to give, jury instructions for abuse of discretion.'" *United States v. Davis*, 609 F.3d 663, 689 (5th Cir. 2010) (quoting *United States v. Webster*, 162 F.3d 308, 321–22 (5th Cir. 1998)). Accordingly, "we review a defendant's objection to the jury instruction by assessing whether the district court's charge, as a whole, was a correct statement of the law and whether it clearly instructed the jurors as to the

---

[7] This is, in fact, a more charitable reading of Garcia's requested jury instruction. The requested jury instruction focused on acts that "the Defendant committed, caused or aided and abetted." The commission of predicate acts is a requirement for proving a substantive RICO violation, and unnecessary in showing a RICO conspiracy violation. The formulation we give Garcia's instructions is closer to the proper standard, but still an incorrect statement of law, as we discuss below.

22

No. 11-40039

principles of the law applicable to the factual issues confronting them." *United States v. Conner*, 537 F.3d 480, 486 (5th Cir. 2008).

RICO provides that "[i]t shall be unlawful for any person to conspire to violate any of [its other] provisions." 18 U.S.C. § 1962(d). As noted above, in order to demonstrate a RICO conspiracy under § 1962(d), the Government must demonstrate "(1) that two or more people agreed to commit a substantive RICO offense and (2) that defendant knew of and agreed to the overall objective of the RICO offense." *United States v. Sharpe*, 193 F.3d 852, 869 (5th Cir. 1999). The use of the term "'overall objective' [in defining RICO conspiracy liability] . . . was designed to *expand*, not restrict, the class of persons subject to conspiracy liability." *Chaney*, 595 F.3d at 239 n.17 (emphasis in original). Consequently, "[a RICO] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense. . . . The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other." *Salinas v. United States*, 522 U.S. 52, 63–64 (1997). In the Fifth Circuit, *Salinas* has been read to "hold[] that [an] individual co-conspirator does not need to personally commit predicate acts to be convicted of a RICO conspiracy." *United States v. Edwards*, 303 F.3d 606, 640 (5th Cir. 2002). Moreover, "[a] defendant need not know exactly what predicate acts the conspiracy intends to perpetrate so long as the defendant knows and agrees to facilitate the 'overall objective' of the conspiracy." *Chaney*, 595 F.3d at 239 n.17.

Garcia's requested instructions at trial—that the jury must unanimously find agreement on his part to commit two *specific* predicate acts—were not legally correct, while the district court's instructions were a proper summation of our caselaw. Accordingly, it was not an abuse of discretion for the district court to reject Garcia's instructions proffered at trial.

　　*5. Conclusion*

No. 11-40039

As Garcia has raised no compelling arguments as to why his convictions should be overturned, we affirm his convictions.

## C. Galindo's Appeal

Galindo's VICAR, 18 U.S.C. § 1959(a)(1), and witness tampering, 18 U.S.C. § 1512(a)(1)(A), convictions are based on the murder of Marcelino Rodriguez. Galindo challenges his convictions on various sufficiency-of-the-evidence grounds.[8]

### 1. Facts

Marcelino Rodriguez (nicknamed "Mars"), a Texas Syndicate member, began cooperating with the Government as a confidential informant sometime around May of 2003. On July 8, 2007, shortly after the first indictment was returned, Mars was killed. At trial, associates of codefendant Fidel Valle, a drug supplier for the Texas Syndicate, testified that they discovered that Mars was a federal informant. Alfredo Sanchez ("Sanchez"), a Texas Syndicate member, testified that these associates passed this information on to members of the Texas Syndicate, who decided to act on this information. According to Sanchez, a meeting was held where it was ordered that codefendant Arturo Rodriguez ("Rodriguez"), a Texas Syndicate prospect, and Galindo would kill Mars. Sanchez also testified that Galindo "wanted to do it [i.e., the murder] himself . . . . [b]ecause [Mars] was an informant and [Galindo] wanted the top seat [in the local branch of the Texas Syndicate]." Alfredo Sanchez also testified that Galindo later admitted to him that he had shot Mars.

The Government called Arturo Rodriguez to testify about Mars's murder. Rodriguez testified that Galindo asked him to help him kill Mars. Rodriguez

---

[8] Galindo also argues that the Government's use of wiretap evidence without an opportunity to cross-examine the speakers on the recording violated his confrontation rights. His claim is meritless because these recordings were not testimonial and thus not within the Confrontation Clause's protections. *See United States v. King*, 541 F.3d 1143, 1146 (5th Cir. 2008); *United States v. Davis*, 270 F. App'x 236, 247 n.9 (4th Cir. 2008).

testified that on the day of the murder he and Galindo went out to lunch with Mars. Rodriguez then testified that after leaving the restaurant, he drove the trio out to an isolated field with Mars next to him in the passenger's seat. They were followed in a different car by codefendant Cristobal Hernandez ("Hernandez"), another Texas Syndicate prospect and Galindo's second accomplice. Shortly after arriving at the field, Rodriguez heard two gunshots and then saw that Galindo had shot and killed Mars. Shortly after the shooting, Galindo then exited the vehicle and got into Hernandez's car. Rodriguez drove the car deeper into the field, parked it, doused the car in gasoline, and burned it with Mars's body inside.

Hernandez confirmed this sequence of events. He said that "[Galindo] planned to kill [Mars] because [Mars] had become a snitch and was going to testify on a lot of other Texas Syndicate [members]." Hernandez testified that after the trio had finished lunch, he followed their car to the field. He saw Galindo by the entry to the field and picked him up. He then drove further into the field to find the first car on fire. Rodriguez then boarded Hernandez's truck and all three drove away. Hernandez said that shortly after they had left the scene of the murder, Galindo remarked that "snitch got what he deserved, [I] took him to his last meal."

### 2. *Sufficiency of the Evidence Claim*

Galindo appeals his convictions on grounds that the Government failed to produce sufficient evidence to convict him under VICAR, 18 U.S.C. § 1959(a), and witness tampering, 18 U.S.C. § 1512(a)(1)(A), in connection with the July 8, 2007murder of Marcelino Rodriguez. As we observed before, sufficiency-of-the-evidence challenges are reviewed de novo and in the light most favorable to the jury verdict, focusing on whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Diaz*, 637 F.3d at 602.

No. 11-40039

i. The Government Proved the Elements of a VICAR Violation

Galindo contends that the Government failed to establish that he participated in an enterprise for purposes of his VICAR conviction. He makes two claims in this regard. First, Galindo argues that the Government did not prove that he murdered Rodriguez for the purposes of furthering the Texas Syndicate's racketeering activities and thus failed to establish one of the three structural features necessary to prove an enterprise under VICAR. To support this argument, Galindo contends that testimony from various Texas Syndicate members supported multiple theories for why he murdered Rodriguez, ranging from the elimination of an informant to the prevention of a "war" with another gang. These theories and the evidence supporting them, Galindo asserts, are insufficient to show that he committed the murder for the specific purpose of furthering his membership in the gang and its racketeering activities.

Second, Galindo argues that the Government failed to prove that his "longevity" with the Texas Syndicate was "sufficient to permit [him] to pursue the enterprise's purposes." *See Boyle v. United States*, 129 S. Ct. 2237, 2244 (2009). To this end, Galindo posits that the Government failed to adduce evidence of his rank, length of participation, how he obtained membership in the Texas Syndicate, or his role in the decision to kill Mars. Essentially, Galindo argues that other than testimony from other Texas Syndicate members that he carried out Rodriguez's murder, the Government produced no evidence that he participated in the gang's core criminal enterprise activities of dealing drugs and committing other violent crimes.

VICAR provides that "[w]hoever . . . for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity . . . murders . . . any individual in violation of the laws of any State or the United States . . . shall be punished . . . ." 18 U.S.C. § 1959(a). There are four elements to a VICAR conviction:

26

No. 11-40039

(1) that [a] criminal organization exists; (2) that th[is] organization is a racketeering enterprise; (3) that the defendant committed a violent crime; and (4) that the defendant acted for the purpose of promoting his position in a racketeering enterprise.

*United States v. Stinson*, 647 F.3d 1196, 1204 (9th Cir. 2011) (citations omitted). A VICAR enterprise is a "partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1959(b)(2).[9] "From the terms of [the statute], it is apparent that an association-in-fact enterprise must have at least three structural features: [1] a purpose, [2] relationships among those associated with the enterprise, and [3] longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 129 S. Ct. at 2244.

Galindo has confused the structural elements that the Government must prove to establish that the Texas Syndicate is a VICAR enterprise, with the evidence that the Government must provide to demonstrate that Galindo murdered Rodriguez to further his position in the Texas Syndicate. The Government is not required to show that Galindo's participation in the murder of Rodriguez and his time with the Texas Syndicate would be sufficient, considered alone, to establish an association-in-fact enterprise. Rather, the individual defendant, as well as his particular acts, and the enterprise, including its structural elements, are distinct elements of proof, such that the latter is not required to be wholly defined by the former. Here, the Government has proven

---

[9] Courts treat this definition as identical to that in RICO. *See* 18 U.S.C. § 1961(4) ("'[E]nterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."); *see, e.g.*, *United States v. Cooper*, 343 F. App'x 830, 831 (3d Cir. 2009) (using RICO caselaw to define VICAR enterprise). Thus, a RICO "'enterprise includes any union or group of individuals associated in fact' and that [definition] reaches 'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Boyle*, 129 S. Ct. at 2243 (quoting *United States v. Turkette*, 452 U.S. 576, 580, 583 (1981)).

both that Galindo murdered Rodriguez to further his position in the Texas Syndicate and the existence of an enterprise.

First, there was sufficient evidence for a rational jury to find that Galindo murdered Rodriguez for the purposes of either maintaining or increasing his position in the Texas Syndicate. As noted above, there was substantial evidence that Galindo killed Mars to further his position in the Texas Syndicate. In determining whether a murder was carried out "for the purpose of . . . maintaining or increasing position in a[] [racketeering] enterprise," 18 U.S.C. § 1959(a), "[s]elf-promotion need not be the defendant's sole or primary concern; rather, Congress intended to proscribe violent acts committed 'as an integral aspect of membership in such enterprises.'" *United States v. Wilson*, 116 F.3d 1066, 1078 (5th Cir. 1997) (quoting *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992)), *overruled on other grounds by United States v. Brown*, 161 F.3d 256, 257 n.1 (5th Cir. 1998).

As noted above, numerous witness testified against Galindo and as to the purpose of the murder. The jury was free to weigh the credibility of all these witnesses and find that the Galindo carried out the killing as an integral aspect of his membership in the Texas Syndicate. Indeed, Galindo's decision to murder Mars, a confidential informant, was consistent with furthering the ends of the Texas Syndicate as a criminal enterprise. Thus, there was sufficient evidence for a rational jury to find that Galindo sought to further his position in, as well as the overall goals of, the Texas Syndicate when he murdered Rodriguez.

The Government also proved that the Texas Syndicate met the VICAR definition of an association-in-fact enterprise. The Government showed that the gang has been in existence since at least 1989, and that it has a clear organizational hierarchy, including a president and vice president, as well as local chapters run by a chairman, a lieutenant, and other officers. The Texas Syndicate also has rules and procedures which govern its conduct, including the

induction of new members and the carrying out of assassinations. Finally, the various murders and drug trafficking offenses charged within the indictment constituted racketeering activity for the purposes of VICAR. *See* 18 U.S.C. § 1959(b)(1) (adopting RICO's definition of racketeering activity, which includes murder chargeable under state law). This evidence shows that the Texas Syndicate had a purpose, relationships among its members, and longevity sufficient to meet the requirements of VICAR. Such a conclusion finds support in the holdings of sister circuits. *See, e.g.*, *Stinson*, 647 F.3d at 1203–05 (affirming VICAR conviction of gang member involved in criminal organization similar to the Texas Syndicate); *United States v. Bingham*, 653 F.3d 983, 992–94 (9th Cir. 2011) (concluding that prison gang was a RICO enterprise).

ii. The Government Proved the Elements of Witness Tampering

Galindo also challenges the sufficiency of the evidence for his witness tampering conviction. Galindo's argument appears to be that because there was "conflicting" testimony as to why Galindo murdered Rodriguez, this "establishes there was no clear basis as to Mr. Galindo's intent for murdering Mr. Rodriguez," and so the evidence presented was insufficient to show that Galindo killed Rodriguez to prevent him from testifying against the Texas Syndicate, negativing the intent requirement for a witness tampering conviction.

The witness tampering statute penalizes the "kill[ing] [of] or [an] attempt[] to kill another person *with intent to . . . prevent the attendance or testimony of any person in an official proceeding*." 18 U.S.C. § 1512(a)(1)(A) (emphasis added). This intent need not be shown by direct evidence. *Cf. United States v. Trejo*, 610 F.3d 308, 315 (5th Cir. 2010) ("Determining whether specific intent to commit promotion money laundering has been proven is necessarily a fact-bound inquiry frequently turning upon circumstantial evidence."); *see also United States v. Ismoila*, 100 F.3d 380, 387 (5th Cir. 1996) (explaining that proof

of intent can be shown "by inference from all of the facts and circumstances surrounding [the criminal acts]").

Here, the circumstantial evidence strongly indicates that Galindo killed Mars to prevent him from testifying. Shortly after the original indictment in this case was returned on March 27, 2007, the Texas Syndicate discovered that Mars had been cooperating with the Government as an informant. On July 8, 2007, Galindo killed Mars. Repeated testimony at trial confirmed that Galindo committed the murder with the specific intent to prevent Rodriguez from testifying against the Texas Syndicate.

### 3. Conclusion

Galindo has not shown that the Government failed to adduce sufficient evidence to justify his VICAR and witness tampering convictions. Consequently, we reject his appeal on these grounds.[10]

## IV. CONCLUSION

For all of the foregoing reasons, we AFFIRM Defendants' convictions.

---

[10] Galindo also argued that the Government had failed to identify the charred body recovered from the scene of the crime as Mars because it did not produce dental records identifying the corpse as Mars. This argument is unpersuasive. In this case, there was ample other evidence indicating that Marcelino Rodriguez was the murder victim. *Cf. United States v. Agofsky*, 20 F.3d 866, 873 (3d Cir. 1994) (holding that improper admission of unauthenticated dental records was harmless error because the prosecution introduced additional circumstantial evidence of victim's identity). Arturo Rodriguez, Galindo's accomplice, knew Mars and testified that it was indeed Mars who Galindo shot and killed. The Government also introduced the testimony of Alfredo Sanchez and Cristobal Hernandez who assisted in the planning and execution of the murder and who both later heard Galindo claim credit for it. Finally, the Government produced evidence that showed that the corpse recovered at the scene of the murder was the same corpse that was autopsied.